POWERS *v.* MERKLEY.

1. LANDLORD AND TENANT—PROLONGED OCCUPANCY—CONSTRUCTIVE EVICTION—SANITATION.

Tenant who continued to occupy premises for dairy plant for upwards of six years, and after being in possession some two years had spent $7,000 for an addition, may not complain that the premises were unfit for purposes leased from inception of lease and that he was justified in abandoning lease on theory of constructive eviction because of insanitary conditions.

2. SAME—CONSTRUCTIVE EVICTION — PLUMBING SYSTEM — USE OF OTHER PORTIONS OF PREMISES BY OTHERS.

Record in lessor's action for rent and for breach of lessee's covenant to repair *held,* insufficient to sustain lessee's claim that insanitary conditions of basement and first story of building which he leased were due to use of plumbing system made by other lessees on second floor; hence he failed to justify abandonment of lease because of alleged constructive eviction.

3. SAME—REPAIR—COVENANT IN LEASE.

Under written lease providing lessee should keep premises in repair and at expiration of term deliver up the same in like condition as when taken, reasonable use and wear thereof and damage by the elements excepted, it was the lessee's duty to keep the premises in repair.

4. SAME—RENT—BREACH OF COVENANT TO REPAIR—DAMAGES.

In lessor's action for accrued rentals and for breach of lessee's covenant to repair, tried without a jury, on appeal, lessor *held,* entitled to judgment for rentals accrued prior to commencement of action, with legal interest thereon, and sum for which undisputed testimony shows payment had actually been made for repairs, but not for so-called estimated damages.

Appeal from Genesee; Black (Edward D.), J. Submitted February 21, 1940. (Docket No. 145, Calendar No. 40,758.) Decided April 1, 1940.

Assumpsit by Harvey M. Powers and wife against Forbes K. Merkley for rent due under a lease and for breach of covenant to repair. Judgment for defendant. Plaintiff appeals. Reversed and remanded for entry of judgment for plaintiff.

*Carton, Gault & Davison,* for plaintiffs.

*Guy W. Selby,* for defendant.

NORTH, J. Plaintiffs leased to defendant for 13 years and 5 months from August 16, 1929, at a monthly rental of $270, the first story and basement of property fronting on North Saginaw street in Flint, Michigan. Defendant occupied the property until December 16, 1936, when he surrendered possession to plaintiffs. He had previously given written notice that he would vacate on that date; and in reply had been notified in writing by plaintiffs that they would hold him to the terms of his lease. In August, 1937, plaintiffs instituted this suit to recover monthly rentals alleged to have accrued from and after January 16, 1937, in the amount of $1,890 and also to recover damages in the alleged amount of $1,500 for defendant's breach of his covenant in the lease to keep the premises in good repair. Defendant denied liability and by affirmative answer charged that plaintiffs, who retained for occupancy or rental purposes four apartments located in the second story of the building, by their use of inadequate and improperly constructed sewer connections servicing that part of the building rendered the leasehold premises insanitary and unfit for use in defendant's business, *i. e.,* a dairy plant wherein milk and cream were prepared for sale, and butter and ice cream were manufactured, stored and prepared for delivery. After hearing without a jury

the circuit judge entered judgment in favor of defendant.   Plaintiffs have appealed.

Appellee asserts the premises were so unfit for the purposes for which they were leased or that they were rendered so unfit by appellants' improper or careless use of the portion of the property to which they retained possession that appellee was justified in terminating the lease on the theory of constructive eviction.   His position is stated in his brief as follows:

"In the case at bar the building was unfit for the purpose for which it was leased at the inception of the lease and known to appellants to be unfit at the time the lease was executed.   The insanitary conditions existing when appellee took possession of the premises were aggravated and made worse by appellants in their use of the part of the building reserved for themselves and over which appellee had no control and to which he had no access."

While he complains of some decidedly inconsequential and unsatisfactory conditions in and about the premises, the only matter of serious consequence is appellee's claim that the plumbing laid in and under the cement floor of the basement and which was designed to carry off the water from the floor drains and the discharge from the toilets in the building was inadequate or because of misuse by appellants or their tenants it frequently became clogged and resulted in the basement floor being flooded and an insanitary condition in the leased premises.   The record conclusively discloses that in the latter part of appellee's occupancy there was much trouble with the sewer system; and there is conflict in the testimony as to whether the clogging of the pipes which resulted in flooding the basement floor was caused by appellee's abuse of or failure to care properly for

the drainage pipes in the part of the building used by him, or whether this trouble came from misuse or overloading the portion of the plumbing system which served the second floor of the building occupied by appellants and their tenants. On the second floor there were two fully equipped toilets and bathrooms. The fixtures were connected with a soil pipe in the basement floor about half way from the front to the rear of the leased area, the outlet into the main sewer being in the front of the building. About two years after appellee's occupancy began, because he needed more space for his business, he constructed at the rear of the leased premises an addition approximately 70 feet in length and 26 feet in width. Prior to this addition there were five floor drains in the basement, each being connected by a two-inch pipe with a four-inch soil pipe which extended lengthwise of the building. Three other floor drains were installed in the addition constructed by appellee.

Appellants claim that the trouble with the plumbing system was caused by appellee's failure to care properly for the pipes and cleanouts or catchbasins which were installed in connection with the basement floor drains and possibly by overloading in consequence of the extra drainage from the addition constructed by appellee. A plumber who was sworn as a witness for plaintiff and who examined the plumbing and replaced floor traps and basement drains, testified:

"The floor drains are the ones I replaced. They were damaged. I replaced the connection pipe between the floor drain and the point where it intersects with the trunk line. I did not replace any of this main trunk line running through the center of the building. * * * It (the main trunk line) was

open, but still we ran that rod through, but found no obstruction the whole length of the trunk line. * * * The traps were damaged and filled up with some substance, I could not say what, a solution or else natural lime or something. They were blocked right up and of no use whatever. The pipe itself was of no use, that is just the trap. We had to chisel out the cleanout. * * * There was nothing over the top of that trap. That has been going on for years. * * * There were no traps on any of their drains. A trap is to keep sewer gas out of the building. When you take the trap out and the cleanout out, you have no trap and sewer gas develops. That was apparent to any person who looked down into one of those floor drains. * * * The floor drains have been used by taking out the cleanout plug and use that for the drain. Without that cleanout plug nasty odors came out from the drain, and the odors would be apparent to a person going into the building. The trap also acts as a protection against waste material going into the sewer.''

Without question during the last year or so while appellee remained in the premises the backing up of the drainage caused much trouble. Inspectors from the city dairy and food department complained of the condition of the premises as being unfit for carrying on appellee's business, and insisted that the objectionable condition be remedied. Notwithstanding this, if the condition was one for which appellee was responsible, it would not justify him in abandoning his lease on the theory of constructive eviction.

Our review of the record forces the conclusion appellee cannot be heard to complain that from the beginning of his tenancy in 1929 the leased premises were unfit for the purposes for which they were leased. The mere fact that he continued to occupy the property and use it for more than six years is

quite conclusive against such a defense. There is no testimony of complaints by public authorities prior to 1934. Beyond any doubt appellee considered and accepted the premises as reasonably suited to his needs, otherwise he surely would not have expended, as he did, $7,000 in enlarging the premises two years after he went into possession. In fact plaintiff testified:

"I believe we bought a new sewer rod about a year and a half or two years after the lease was signed. It kept gradually getting worse. When we first moved in it wasn't like it was in 1935 and 1936."

There is no merit to appellee's claim that from the inception of his lease the premises were unfit for his use. Nor does the record sustain appellee's claim that the trouble was caused by the use of the plumbing system by plaintiffs and their tenants who occupied the second floor of the building. Notwithstanding appellee's claim to the contrary, the testimony fully establishes the fact that the occupancy of the second floor was the same, at least substantially so, from the time his tenancy began in 1929 as it was later in 1935 and 1936 when appellee asserts that the trouble was caused by the use the second floor tenants made of the plumbing system. And it may be noted there is no testimony of a flooding or a backing up of the drainage after appellee vacated the premises. Instead an assistant city plumbing inspector, who was a witness in behalf of appellee and who in May, 1937, inspected the premises for the purpose of determining what repairs or alterations were necessary, testified as follows:

"Q. Tell the court the condition you found those sewers in.

"A. Well, the sewer traps were gone and the cleanout plugs missing. There was no water on the

floor and it was dry. * * * There were more than one (of the traps) broken, but I do not know how many. The covers on the cleanout plugs were missing."

At the conclusion of the proofs, the trial judge by a statement in the record indicated that he was perplexed as to what caused the flooding of the basement floor and that he was impressed by the fact that the condition was more troublesome in the morning than at other times notwithstanding appellee's business was not operating during the night. While the trial judge did not attempt to make a definite finding of facts, seemingly the above-noted circumstance caused him to find for the appellee. Aside from his final conclusion the record contains no indication of the trial judge's view of the legal aspect of the case. We think it was this which led to an erroneous result. The written lease between these parties for a period of 13 years and 5 months contains no provision, except in case of damage by fire, requiring the lessors to keep the premises in repair during the leasehold period. Instead the lease expressly provides:

"And also, that said party of the second part (lessee) will at its own expense, during the continuance of this lease keep the said premises and every part thereof in as good repair, and at the expiration of the term, yield and deliver up the same in like condition as when taken, reasonable use and wear thereof and damage by the elements excepted."

Under such a lease it is the tenant's duty to keep the premises in repair. *Petz* v. *Voight Brewery Co.,* 116 Mich. 418 (72 Am. St. Rep. 531); *Lieberthal* v. *Montgomery,* 121 Mich. 369; *Rhoades* v. *Seidel,* 139 Mich. 608 (18 Am. Neg. Rep. 135). That the condition of which appellee complains could have been readily remedied is conclusively shown by the fact

that after he vacated the premises complete repair of the plumbing was accomplished at a cost of $181.83. The conclusion follows that appellee's abandonment of the premises and his attempt to avoid his obligations under the lease cannot be justified on the theory of constructive eviction or for any other reason appearing in this record. Appellants should have had a judgment in the trial court for the accrued and unpaid rentals.

Appellants' claim for compensation for damages to the leasehold property resulting from appellee's failure to keep the premises in proper repair is based on the provision of the lease hereinbefore quoted. The testimony on this phase of the case is none too satisfactory. But appellants produced testimony showing that the total damage amounted to $1,578.98. However, of this amount, $566 was only estimated damages. The balance of the items was for repairs for which the undisputed testimony shows payment had actually been made. In their briefs appellants admit because of conflict in the testimony they may not be entitled to recover in excess of $1,012.98 on this phase of the case; and such is our conclusion.

When suit was started, 7 months' rental had accrued, totaling $1,890. Judgment should be entered for that amount in the circuit court, together with interest at 5 per cent. per annum from the date of commencing suit, and also for the additional amount of $1,012.98 for damages to the property. It is so ordered and the case is remanded for compliance herewith. Appellants will have costs of both courts.

Bushnell, C. J., and Sharpe, Potter, Chandler, McAllister, Wiest, and Butzel, JJ., concurred.